UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
CINTO MEJIA,                                       :
                                                   :
                        Petitioner,                :
                                                   :        **MEMORANDUM & ORDER**
            -against-                              :        No. 12 Civ. 2241 (VMS)
                                                   :
DALE ARTUS, Superintendent, Wende                  :
Correctional Facility,                             :
                                                   :
                        Respondent.                :
-------------------------------------------------------- x

**Scanlon, Vera M., United States Magistrate Judge:**

**I.      Introduction**

         Pro se Petitioner Cinto Mejia ("Petitioner"), after a bench trial before New York Supreme

Court Justice Neil Jon Firetog, was convicted of manslaughter in the first degree and sentenced

to twenty-two years in prison and five years of post-release supervision.  Tr. of Pet'r's State

Court Trial ("Trial Tr.") at 156 & Tr. of Pet'r's Sent. ("Sent. Tr.") at 16-17 attached as Ex. A to

Resp. to Order to Show Cause ("Resp."), ECF No. 6.  He now petitions this Court pro se for a

writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Pet. for Writ of Habeas Corpus ("Pet."),

ECF No. 1.[1]  The Court ordered the District Attorney of Kings County to show cause "why a

writ of habeas corpus should not be issued."  Order to Show Case, ECF No. 4, to which the

District Attorney of Kings County ("Respondent" or "the People") responded.  See generally

Resp.

-----------------------

[1] In reviewing the petition, the court is mindful that a "document filed pro se is to be liberally
construed, and a pro se complaint, however inartfully pleaded, must be held to less stringent
standards than formal pleadings drafted by lawyers."  Erickson v. Pardus, 551 U.S. 89, 94 (2007)
(internal quotation marks & citations omitted).  Petitioner attaches to his petition his briefs to the
New York State Appellate Division and incorporates them by reference in his petition, and the
Court will therefore consider them.  Pet. at 3.

In this habeas petition, Petitioner challenges his conviction and confinement by arguing that Respondent failed to prove his guilt beyond a reasonable doubt; that he was denied the effective assistance of counsel and his United States Constitution Sixth Amendment right to confront the witnesses against him when defense counsel entered into a stipulation to admit a DNA report at trial; and that his inculpatory statement to the police which was admitted at trial was obtained in violation of his United States Constitution Fifth Amendment right to counsel. See generally Pet.  For the reasons set forth below, Petitioner's petition is denied in its entirety.

**II.     Background**

In brief, after a bench trial before New York Supreme Court Justice Neil Jon Firetog, Justice Firetog found Petitioner guilty of manslaughter in the first degree. See generally Trial Tr. Petitioner was convicted of stabbing Mr. Anthony Senisi as Mr. Senisi walked past Petitioner on the way home to his apartment from buying milk at the store.  Mr. Senisi died 40 to 45 minutes later as the stab wound had severed both iliac arteries.  Petitioner was with two other individuals at the time of the incident, Mr. Angel Terron and Mr. Jairo Carillo, who identified Petitioner to New York Police Department ("NYPD") detectives and, after Petitioner's arrest, identified Petitioner in a line-up.  The detectives recovered clothes from Petitioner's home with blood on them, which DNA tests confirmed was Mr. Senisi's blood.  Petitioner was arrested on August 8, 2007 at a relative's home in Pennsylvania.  Petitioner then waived his Miranda rights and gave oral and written statements to NYPD detectives.

Respondent has submitted the state court trial record for Case No. 7645/07, pursuant to which Petitioner was convicted for manslaughter in the first degree based on events occurring on August 4, 2007.  The following is a factual summary of Petitioner's case drawn from: (1) the transcripts of Petitioner's bench trial, conviction and sentencing; (2) Petitioner's and

Respondent's state appellate briefs, and the decision and order issued by the Second Department of the New York State Supreme Court, Appellate Division ("Appellate Division"), affirming Petitioner's conviction; and (3) Petitioner's application for leave to appeal to the New York State Court of Appeals and the Court of Appeals certificate denying leave to appeal.

### a. Summary Of Evidence Presented At Bench Trial

### i. Testimony Of NYPD Officer Frederick Drone

Officer Drone testified that at 10:58 p.m. on the night of August 4, 2007, he responded to a radio dispatch indicating that a man was shot. Trial Tr. 9-10. When he arrived at the scene, he noticed a man lying on his back, but he observed very little blood on the victim. Id. The victim, who Officer Drone later identified as Mr. Senisi from the identification cards in the victim's wallet, was surrounded by his father and brother. Id. at 19. EMS arrived shortly thereafter and located a stab wound on Mr. Senisi, secured him to a gurney, and took him in an ambulance to Lutheran Medical Center. Id. at 10-11. Officer Drone rode in the ambulance and performed CPR on Mr. Senisi. Id. After arriving at the hospital, Mr. Senisi was pronounced dead. Id. at 13. The next day he identified Mr. Senisi for the Chief Medical Examiner at the morgue. Id.

### ii. Testimony Of Jairo Carillo

Mr. Carillo testified that he was a member of the gang Panchitos, or "PCS", along with Petitioner (who he identified in the courtroom at trial). Id. at 26. On August 4, 2007, at approximately 11:00 p.m., he stated that he was "hanging out" in front of his house in Brighton Beach with Mr. Angel Terron. Id. at 26. Mr. Carillo testified that Petitioner, who he knew from PCS, approached the two men and that Petitioner appeared angry. Id. at 26-29. Mr. Carillo testified that Petitioner stated he had been jumped and appeared to have scratch marks on his face. Id. at 29-31. Mr. Carillo said that he and Mr. Terron then began walking up Brighton 6th

Street with Petitioner to the train station. Id. at 31-32. Petitioner did not say anything during this time. Id. As they approached the corner, a white male who was carrying a grocery bag walked towards them. Id. at 32. The white male did not say or do anything other than walk with a shopping bag in his hand. Id. at 50. Mr. Carillo stated that as the individual approached Petitioner, Petitioner swung out three times at the individual's left side saying "what up, Puto?" Id. at 33-34. As Petitioner pulled away, Mr. Carillo saw a knife in his hand. Id. Petitioner then walked away. Mr. Carillo said he saw the individual drop to the ground, bleeding and crying for help. Id. at 34-35. After staring at the individual, Mr. Carillo ran back home with Mr. Terron. Id. at 34-35. Approximately two hours later, NYPD detectives came to Mr. Carillo's house and questioned him. Id. at 35-36. They then took him to view a line-up four days later, during which he identified Petitioner as the person who had stabbed the white male. Id. at 36-37.

### iii. Testimony Of NYPD Detective Michael Taylor

Detective Taylor testified that he was called to 2852 Brighton 6th Street to investigate a 911 call. Id. at 52-53. Detective Taylor observed a victim being placed into an ambulance when he arrived. Id. at 53. Detective Taylor then began canvassing the area and looking for witnesses. Id. at 54. He later spoke to Mr. Terron and took him back to his precinct. Id. at 55. Mr. Terron gave Detective Taylor Petitioner's name and information about Petitioner's prior arrest. Id. With this information, Detective Taylor was able to determine Petitioner's address. Id. at 56. On August 5, 2007, Detective Taylor went to Petitioner's home, which was a single room occupancy building, and spoke to the building's porter, Ms. Marjorie Bonilla. Id. at 56-57. Ms. Bonilla indicated that Petitioner had been in a fight, and that she had cleaned blood from in front of the building. Id. at 57. The building's owner, Mr. Kurtz, took Detective Taylor and his partner to Petitioner's room. Detective Taylor observed blood leading to and in front of

Petitioner's room. Id. Detective Taylor knocked on the door to Petitioner's room, but when there was no answer, Mr. Kurtz let him in. Id. at 58. Detective Taylor observed bloody clothes on the bed. Id.

At this point, Detective Taylor went to obtain a search warrant for Petitioner's room. Id. at 59-60. Detective Taylor returned to the building where Petitioner lived with the search warrant and crime scene investigators. Id. The search warrant was executed, and the bloody clothes were vouchered and sent to the lab for DNA analysis. Id. at 64.

### iv. Testimony Of Eyewitness Angel Terron

Mr. Terron testified that he was a member of the gang PCS until the night of August 4, 2007, when he decided to leave the gang. Id. at 73-74. On that night, he was playing cards outside his house with his brother and Mr. Carillo. Id. at 74. Mr. Terron testified that Petitioner (who he identified in the courtroom at the trial), who he knew from PCS by his nickname, Adrian, approached the group and said he had been stabbed in the leg. Id. Mr. Terron then testified that Petitioner called him over to take a walk with him. Id. at 76. Mr. Terron stated that Petitioner seemed drunk and mad. As Petitioner walked, he stated that he was going to get revenge on the person that stabbed him. Id. at 76-77. Mr. Terron then testified that "out of nowhere," Petitioner stabbed a man who was walking towards him carrying bags. Id. at 78. The man did not say anything or make any movements towards Petitioner. Id. at 78-79. Mr. Terron stated that Petitioner called the man a "stupid mother fucker" and stabbed him once on his left side with a six to twelve-inch cooking knife. Id. at 79-80. After Petitioner stabbed the man, he

walked up the street and disappeared.  Id. at 80.  The victim was on his feet, then he fell down screaming.  Id. at 81.  Mr. Terron said he then ran back home.  Id. at 81-82.

Later on, NYPD detectives came to take Mr. Terron in for questioning.  Id. at 82.  He told the detectives Petitioner's name and about his prior arrest.  Id.  A few days later, Mr. Terron identified Petitioner in a line-up.  Id. at 83.

### v.  Testimony Of Eyewitness Sergey Efremov

Mr. Efremov testified that he and his friend were smoking a cigarette outside of his apartment on the night of August 4, 2007, between 10:30 p.m. and 11:00 p.m.  Id. at 97.  He then saw three or four individuals of Mexican descent walk around the corner.  Id. at 97-98.  At the same time, an Italian man walked from the opposite direction and towards the group of Mexican men.  Id. at 98-99.  One of the three or four individuals approached the Italian man.  Id. at 99.  According to Mr. Efremov, the man who approached the Italian man was wearing three-quarter-length jeans and a navy collared t-shirt.  Id. at 99.  He said that a Mexican man approached the Italian man and stabbed him.  Id. at 99-100.  He yelled something unintelligible at the Italian man that Mr. Efremov could not understand.  Id. at 101.  Mr. Efremov stated that the knife was wrapped in something and that the Mexican man unwrapped it before stabbing the Italian man.  Id. at 101-02.  The Italian man did not say anything to any of the Mexican men before the one individual stabbed him.  Id. at 102.  The Italian man then ran a few feet towards his house before falling, while at the same time, the Mexican man walked away "really slow[ly]" towards Neptune Avenue.  Id. at 101-03.  Mr. Efremov then saw two of the other Mexican men run back in the direction from which they had come.  Id. at 103.  None of the other two or three Mexican

men said anything to the Italian man or made any gestures towards the victim.  Id. at 104.  Mr. Efremov was approximately fifteen feet from where the incident occurred.  Id. at 105.

### vi.  Testimony Of Medical Examiner Floriana Persechino

Dr. Persechino is a forensic pathologist for the Chief Medical Examiner of the City of New York and has been employed with them for ten and a half years.  Id. at 115.  She was admitted as an expert in the field of forensic pathology.  Id. at 116.  Dr. Persechino testified that she performed an autopsy on Mr. Senisi.  Id. at 117.  She identified a stab wound on Mr. Senisi's back that entered through the back, into his abdominal cavity, through the left common iliac artery and entered the right common iliac artery.  Id.  As a result of the stab wound, there was internal bleeding.  Id. at 117-18.  The wound was approximately five-and-a-half-to-six-and-a-half inches deep.  Id. at 118.  From the depth, width and edges of the wound, Dr. Persechino was able to formulate that the wound was caused by a smooth blade that was five to six inches in length, three-quarters of an inch wide and one-sixteenth of an inch tall.  Id. at 122.  According to Dr. Pereschino, the stab wound to the back that injured the iliac arteries caused Mr. Senisi's death.  Id.

### vii.  Testimony Of NYPD Detective Wayne Perry

Detective Perry testified that he was assigned to Brooklyn South Homicide Squad on August 4, 2007.  Id. at 124-25.  He was assigned to assist in the investigation of the stabbing of Mr. Senisi.  Id. at 126.  On the night of August 4, 2007, he was called to the scene of the stabbing where he interviewed a woman who said that Mr. Terron and Mr. Carrillo were with the person who stabbed Mr. Senisi and she directed him to their home.  Id. at 127.  Detective Perry testified that he interviewed Mr. Terron first.  Id.  Mr. Terron told Detective Perry that Petitioner (who Detective Perry identified in the courtroom at the trial) had stabbed Mr. Senisi and Petitioner had

previously been arrested in Queens on a specific date. Detective Perry pulled up the photographs of everyone in New York City who was arrested on that date, and as Mr. Terron sifted through the photographs, he was able to identify Petitioner as the stabber. Id. at 128.

Detective Perry stated that Petitioner was apprehended in Hazelton, Pennsylvania on August 8, 2007. One of Petitioner's friends had told Detective Perry where Petitioner was staying. Detective Perry's partner knocked on the door of the location with a photo of Petitioner and the man who answered the door said that Petitioner was upstairs. Id. at 129. Detective Perry took Petitioner to the Hazelton State Trooper barracks to conduct an interview. Id. Detective Craig, from the NYPD 60th Precinct Detective Squad, interviewed Petitioner with Detective Perry. Id. at 129-30. Detective Craig read Petitioner's Miranda warnings to him in Spanish as Detective Craig is fluent in Spanish. Id. at 130. The NYPD's 60th Precinct had faxed to the Hazelton state troopers the Miranda warnings, which were the warnings that the NYPD used for every arrest. Petitioner indicated his Miranda warnings were read to him by initialing and signing next to each warning on a form that was admitted into evidence. Id. at 131.

Petitioner then gave a statement to Detective Perry in English. He said that he had drunk five to six beers and was on his way home when he was jumped by a group of Salvadoran people. Id. at 132. He went to clean himself up at his apartment and went back out, but the Salvadoran people were gone. Id. at 132-33. He then went to find his friends, Mr. Terron and Mr. Carillo, and they walked together along Brighton 4th Terrace. When they reached the corner of Brighton 6th Street, they crossed paths with Mr. Senisi, and Petitioner stabbed him. Id. Petitioner stated that he had been beat-up and stabbed in the past and that he was afraid of Mr. Senisi, so he stabbed him. Id. at 133. Petitioner stated that he did not remember what he did

with the knife. Id. at 133. After the incident he paid a livery van thirty dollars to take him to Hazelton. Id. at 134.

Petitioner then agreed to give Detective Perry the same statement in writing in Spanish. Id. at 134-35. Petitioner then tore up the paper after writing down his statement. Id. Detective Perry recovered the pieces of the written statement and sent them to the NYPD lab to have the statement put together and translated, which it later was. Id. at 135-35. At the top of the paper, Detective Perry wrote the date and time and stated that Petitioner's Miranda warnings were read to him. Id. at 136. The statement and a translation were admitted into evidence. Id. at 136-38.

Petitioner then agreed to record the same statement on an audiotape in Spanish. Id. at 135. The audio recording and a translation were admitted into evidence. Id. at 137-38.

Petitioner was offered food and drink when he was first taken into custody. Id. at 138. The entire interview process lasted approximately two and a half to three hours. Id. at 129, 139. Petitioner was eventually brought back to New York and charged with homicide. Id. at 139.

On cross-examination, Petitioner's attorney clarified that Detective Perry does not speak Spanish and therefore could not independently determine whether Detective Craig's translation of his Miranda rights was fair and accurate. Id. at 140-41. Detective Perry also promised Petitioner that his two friends would not be arrested. Id. at 141.

### viii. DNA Report Stipulation

The parties stipulated that the chain of custody had been maintained for three items – a pair of blue jean shorts, a multi-colored blanket and a blue t-shirt – that had been recovered from Petitioner's apartment and sent to the Chief Medical Examiner. Id. at 92-93. The parties also stipulated to the admission of a DNA report from the Chief Medical Examiner that showed that

Mr. Senisi's DNA was found on the clothes that were recovered from Petitioner's apartment. <u>Id.</u> at 92-93, 111; Resp. at 8; Pet'r's App. Br. attached to Pet. at 3-9.

### ix. Petitioner's Pre And Post-Trial Motions

At the end of the People's presentation of evidence, Petitioner's attorney moved to have the physical evidence (the clothing) suppressed, arguing that the search of Petitioner's home was in violation of his constitutional rights and the application to obtain the search warrant was improper. Trial Tr. at 143-44. Respondent argued that there was sufficient probable cause to go into the location where the clothing was recovered and that the search warrant was properly executed. <u>Id.</u> at 145. Petitioner's attorney also moved on the record to suppress the identification of Petitioner. <u>Id.</u> at 144. In opposition, Respondent contended that both witnesses knew Petitioner. <u>Id.</u> at 145. In particular, Mr. Carillo saw Petitioner at least two times a week and had known him for a couple of months. <u>Id.</u>

Petitioner's attorney also moved to suppress Petitioner's statement on the grounds that there was not sufficient proof to establish that Petitioner knowingly and voluntarily waived his <u>Miranda</u> rights. <u>Id.</u> at 145. Respondent argued in opposition that Detective Perry indicated that Detective Craig translated directly from the form, that it was a self-serving statement and that the tone of the audiotape indicated that the defendant gave the statement after knowingly and voluntarily waiving his rights. <u>Id.</u>

Petitioner's attorney then moved to dismiss the case on the basis that the People had not made a <u>prima</u> <u>facie</u> case. <u>Id.</u> at 144.

The Supreme Court denied Petitioner's pre-trial motions as to the clothing and the identifications. <u>Id.</u> at 146. The Court indicated that it wanted to review the audiotape before deciding whether the People had shown beyond a reasonable doubt that it was given knowingly

and voluntarily, and although the Court indicated that as all three statements were consistent, "the People may have, in fact, met their burden." Id. at 147. The Court decided it would also reserve judgment on Petitioner's post-trial motion to dismiss based on his decision on the admissibility of Petitioner's statements. Id.

### x. Closing Arguments

During closing arguments, Petitioner's attorney asked the Court to consider manslaughter in the first and second degrees in lieu of a conviction of murder in the first and second degrees. Id. at 151.

### xi. Petitioner Was Convicted Of Manslaughter In The First Degree

On December 10, 2008, Justice Firetog found Petitioner guilty of manslaughter in the first degree. Trial Tr. at 159.

### xii. The Trial Court Sentenced Petitioner

On January 5, 2009, Justice Firetog sentenced Petitioner to a term of imprisonment of twenty-two years and five years of post-release supervision. Sent. Tr. at 16-17

### xiii. Petitioner Appealed His Conviction

Petitioner's appellate counsel appealed his conviction, asserting that the People failed to prove beyond a reasonable doubt that Petitioner intended to seriously injury Mr. Senisi, in order to sustain a conviction of manslaughter in the first degree. Def.'s Br. to App. Div. attached as Ex. B to Resp. at 9-15. Petitioner submitted his own pro se appellate brief arguing that he was denied the effective assistance of counsel when his defense counsel stipulated to the admission of a DNA report showing that Mr. Senisi's DNA was found on Petitioner's clothing instead of requiring the People to call her as a witness, and then cross-examining her, Pet'r's App. Br. at 3-

9; and that Petitioner's statements to the NYPD should have been suppressed because the statements were made in violation of Petitioner's right to counsel, Pet'r's App. Br. at 10-16.

### xiv. The New York State Appellate Division Affirmed Petitioner's Conviction

On January 25, 2011, on Petitioner's appeal of his convictions in Case No. 7654/07, the Appellate Division unanimously affirmed the guilty conviction. See People v. Cinto, 80 A.D.3d 775 (2d Dep't 2011). In so ruling, the Appellate Division held that

> To the extent that the defendant contends that the evidence was legally insufficient to establish his guilt of manslaughter in the first degree, that contention is unpreserved for appellate review and, in any event, is without merit. In fulfilling our responsibility to conduct an independent review of the weight of the evidence . . . we nevertheless accord great deference to the factfinder's opportunity to view the witnesses, hear the testimony, and observe demeanor. Upon reviewing the record here, we are satisfied that the verdict of guilt was not against the weight of the evidence. The evidence presented at trial supported a finding that the defendant acted with intent to cause serious physical injury to the victim (see Penal Law § 125.20[1]).
>
> The defendant's contention, raised in his pro se supplemental brief, that the Supreme Court should have suppressed certain statements he made to law enforcement personnel is unpreserved for appellate review, as the defendant did not seek suppression of his statements in the Supreme Court on the ground he now advances. In any event, the defendant's contention is without merit.
>
> The defendant's contention, raised in his pro se supplemental brief, that he was deprived of the effective assistance of counsel is without merit.

Cinto, 80 A.D.3d at 775-76 (internal citations omitted).

### xv. The New York Court Of Appeals Denied Petitioner's Motion For Leave To Appeal The New York State Appellate Division's Decision

On January 25, 2011, the New York Court of Appeals denied Petitioner's motion for leave to appeal the Appellate Division's decision. See People v. Cinto, 16 N.Y.3d 893 (2011).

**b. Petitioner Filed The Instant Habeas Petition**

On May 3, 2012, Petitioner filed the instant habeas petition challenging his convictions in Case No. 7654/07. See generally Pet. In his habeas petition, Petitioner makes the same arguments that were set forth by him and his appellate counsel before the state courts. Pet.; Pet'r's App. Br. attached to Pet.

**III. Legal Standards**

**a. Federal Habeas Applications Brought Pursuant To Section 2254(d)**

**i. Section 2254(d), Generally**

In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA") to regulate "the power of federal courts to grant writs of habeas corpus to state prisoners." See Williams v. Taylor, 529 U.S. 362, 399 (2000) (O'Connor, J., concurring). Under AEDPA, a prisoner in custody pursuant to the judgment of a state court on a claim adjudicated on the merits may file a habeas petition pursuant to Section 2254 of United States Code, Title 28, but a federal habeas petition

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). In other words, AEDPA's "test is fairly read simply as a command that a federal court not issue the habeas writ unless the state court was wrong as a matter of law or unreasonable in its application of law in a given case." Williams, 539 U.S. at 385 (citing 28

U.S.C. § 2254). "This is a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011) (citations omitted). "The petitioner carries the burden of proof." Id.

### ii. The Meaning Of "Clearly Established Federal Law, As Determined By The Supreme Court"

#### 1. "Clearly Established Federal Law, As Determined By The Supreme Court," Refers To The State Of The Law At The Time The Habeas Petitioner's State Conviction Became Final

The definition of "clearly established Federal law, as determined by the Supreme Court," in any given federal habeas case is made with reference to the state of Supreme Court law at the time the habeas petitioner's state conviction became final, unless the Supreme Court makes a new constitutional rule retroactive for the purposes of collateral review. See 28 U.S.C. § 2254(e)(2)(A)(i); Williams, 539 U.S. at 364.

#### 2. "Clearly Established Federal Law, As Determined By The Supreme Court," Need Not Arise From A Fact Pattern That Is Identical To The Fact Pattern In The Habeas Petition Under Review

"In most situations, the task of determining what [the Supreme Court has] clearly established will be straightforward." Lockyer v. Andrade, 538 U.S. 63, 72 (2003). There will be circumstances in which a federal habeas court will be unable to find "clearly established Federal law, as determined by the Supreme Court," with specificity. See Panetti v. Quarterman, 551 U.S. 930, 952-53 (2007). This should not end a federal habeas court's inquiry, for "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule." Id. at 953 (citing Carey v. Musladin, 549 U.S. 70, 81 (2006) (Kennedy, J., concurring in judgment)). "Nor does AEDPA prohibit a federal court from finding an application of a

principle unreasonable when it involved a set of facts 'different from those of the case in which the principle was announced.'" <u>Panetti</u>, 551 U.S. at 953 (citing <u>Lockyer</u>, 538 U.S. at 76). "The statute recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner." <u>Panetti</u>, 551 U.S. at 953 (citing <u>Williams</u>, 529 U.S. at 362); <u>see</u> 28 U.S.C. § 2254(d)(1) (stating that habeas relief may be granted when a state-court decision "unreasonabl[y] appl[ied] . . . clearly established Federal law, as determined by the Supreme Court").

### iii. The Meaning Of "Contrary To" Clearly Established Federal Law, As Determined By The Supreme Court

The Supreme Court has said that a state court's decision is "contrary to" the Supreme Court's clearly established precedents if (1) the decision applies a rule that contradicts the governing rule set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law; or (2) the state court was presented with a set of facts that was materially indistinguishable from facts underlying a decision of the Supreme Court but reaches a different result. <u>See</u> <u>Williams</u>, 529 U.S. at 405-06; <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002) (<u>per</u> <u>curiam</u>). Despite the fact that AEDPA sought to ensure that federal courts would treat state-court decisions with deference, when a court inquires as to what is "contrary to . . . Federal law" in the context of Section 2254(d)(1), "it surely is not a requirement that federal courts actually defer to a state-court application of federal law that is, in the independent judgment of the federal court, in error." <u>Id.</u> at 387.

### iv. The Meaning Of An "Unreasonable Application" Of Clearly Established Federal Law, As Determined By The Supreme Court

An "unreasonable application" of federal law occurs where a state court "identifies the correct governing legal principle" from the Supreme Court's decisions but "unreasonably applies

that principle to the facts of the prisoner's case." Cullen, 131 S. Ct. at 1399. It is also an "unreasonable application" of federal law when a state court "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Williams, 529 U.S. at 407; see Musladin, 549 U.S. at 77 (affirming the denial of habeas relief when no Supreme Court case required the application of a constitutional rule to a new context). In order for a court to find that a state court's application of Supreme Court precedent was "unreasonable" under Section 2254(d)(1), a petitioner must demonstrate that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." Williams, 529 U.S. at 409; Woodford v. Visciotti, 537 U.S. 19, 25 (2002) (per curiam). "The federal habeas court should not transform the inquiry into a subjective one by resting its determination instead on the simple fact that at least one of the Nation's jurists has applied the relevant federal law in the same manner the state court did in the habeas petitioner's case." Williams, 529 U.S. at 409-10.

### v. In The Event That A Petitioner Meets His Or Her Burden Under Section 2254(d), Petitioner May Be Entitled To Habeas Relief Without More, Or Additional Proceedings May Be Needed

In the event that a Petitioner meets his or her burden under Section 2254(d) by showing that the state-court decision was "contrary to" or "an unreasonable application of" "clearly established Federal law, as determined by the Supreme Court," the nature of the proven constitutional violation determines whether the federal habeas court must conduct additional proceedings before granting the petitioner habeas relief.

There are two categories of proven constitutional violations which entitle a petitioner who satisfies the Section 2254(d) standard to habeas relief without more. For example, habeas

relief is obtained in the event that the proven constitutional error is structural, and prejudice is thus presumed. See Vazquez v. Hillery, 474 U.S. 254, 264 (1986) (holding reversal mandatory for unlawful exclusion of members of a defendant's race from the grand jury); McKaskle v. Wiggins, 465 U.S. 168, 177-78 n.8 (1984) (stating that depriving a defendant of the right to self-represent at trial is not harmless). In addition, the petitioner obtains habeas relief when the demonstration of the constitutional error already required the court to find prejudice. See Strickland v. Washington, 466 U.S. 668, 687 (1984) (requiring a showing of ineffective assistance of counsel and prejudice in order to establish a violation of the Sixth Amendment right to counsel); Brady v. Maryland, 373 U.S. 83, 87 (1963) (holding that suppressed evidence favorable to an accused had to have been material to guilt or punishment in order to establish a due process violation from the prosecution's failure to disclose).

There are also certain types of constitutional error which, once established, still require additional inquiry before the federal habeas court may grant the petitioner relief. Under such circumstances, the federal habeas court must examine whether the constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict." See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (finding that the state's improper use for impeachment purposes of the defendant's post-Miranda silence did not have a "substantial and injurious effect or influence in determining the jury's verdict" that the defendant did not accidentally shoot the victim).

## IV. Legal Analysis

### a. Petition Exhausted His State Remedies As Required Before Filing The Instant Habeas Application

Before a petitioner may pursue habeas relief in federal court, he or she must exhaust "the remedies available in the courts of the State." Banks v. Dretke, 540 U.S. 668, 690 (2004)

(quoting 28 U.S.C. § 2254(b)); O'Sullivan v. Boerckel, 526 U.S. 838, 855 (1999); see Galdamez v. Keane, 394 F.3d 68, 73 (2d Cir. 2005). In New York, a defendant is considered to have exhausted his state remedies when the New York Court of Appeals denies the defendant's motion for leave to appeal, unless the denial was for lack of specificity. Id. at 74. Here, as Petitioner appealed his conviction to the New York Court of Appeals and that court denied his motion for leave to appeal without any indication that the application lacked specificity, Petitioner exhausted the state remedies available to him before filing the instant petition.

### b. The Petition Is Untimely

The AEDPA imposes a one-year limitation period on a state prisoner's application for a writ of habeas corpus. See 28 U.S.C. § 2244(d)(1). Here, Petitioner had ninety days from January 25, 2011, when the New York Court of Appeals denied Petitioner's motion for leave to appeal, Cinto, 16 N.Y.3d at 893, to seek a writ of certiorari from the United States Supreme Court, see Saunders v. Senkowski, 587 F.3d 543, 547-49 (2d Cir. 2009); Williams v. Artuz, 237 F.3d 147, 151 (2d Cir. 2001), Ross v. Artuz, 150 F.3d 97, 98 (2d Cir.1998). Once those ninety days expired on April 25, 2011, AEDPA required Petitioner to file his habeas petition within one year, or on or before April 25, 2012. See 28 U.S.C. § 2244(d)(1)(A). Petitioner filed his Petition on May 3, 2012, which was eight days past the April 25, 2015 statute of limitations deadline for filing his petition.[2] Pet. at 1. The Court gave Petitioner an opportunity to identify any reasons

---

[2] District courts in the Second Circuit have consistently looked to the date the habeas petition was signed in order to determine the date on which it is deemed filed. See, e.g., Porter v. Greiner, 00 Civ. 6047 (SJ) (VVP), 2005 WL 3344828, *7 (E.D.N.Y. Nov. 18, 2005) ("Where it is unclear when a pro se state prisoner mailed his or her habeas petition, the court assumes that the petition is filed on the day it is signed and dated."); Johnson v. Coombe, 156 F. Supp. 2d 273, 277 (S.D.N.Y. 2001) ("Although it is not clear when the [petitioner] gave his complaint to prison officials, absent evidence to the contrary, the Court assumes that the prisoner gave his petition to prison officials for mailing on the date he signed it."). Here, the only date on the petition is the May 3, 2012 filing date, and the mailing envelope was not attached to the petition. Therefore,

for the Court to find that the limitations period was tolled, but Petitioner failed to respond to the Court's order. See 2/12/2016 Order.

The AEDPA one-year limitations period is an affirmative defense, not a jurisdictional bar, and it is therefore the respondent's burden to plead it. Acosta v. Artuz, 221 F.3d 117, 122 (2d Cir. 2000). Nevertheless, "district courts are permitted, but not obliged, to consider, sua sponte, the timeliness of a state prisoner's habeas petition," Day v. McDonough, 547 U.S. 198, 209 (2006), provided that the parties are given "fair notice and an opportunity to present their positions," id. at 201, and that the government has not deliberately waived the statute of limitations defense, see Wood v. Milyard, 132 S. Ct. 1826, 1830 (2012). A district court must "determine whether the interests of justice would be better served by addressing the merits or by dismissing the petition as time-barred." Day, 547 U.S. at 210 (internal citations & quotations omitted). Because Respondent does not raise the untimeliness of the petition, the Court will address the merits of Petitioner's claims. See Jamison v. Auburn Corr. Facility, 10 Civ. 3440 (MKB), 2015 WL 8770079, at *5 (E.D.N.Y. Dec. 14, 2015) (considering time-barred Section 2254 habeas petition where respondent failed to raise the untimeliness of the petition).

### c. Petitioner's Habeas Petition Fails Procedurally And On Its Merits

#### i. Petitioner's Claim That Respondent Failed To Prove His Guilt Beyond A Reasonable Doubt Is Procedurally Barred By Independent And Adequate State Grounds And Is Without Merit

Petitioner argues that the People failed to prove beyond a reasonable doubt that Petitioner intended to seriously injure the victim when he swung at him with a knife, and that the conviction was against the weight of the evidence. Pet. at 6. Respondent argues that the Court is

---

the Court is unable to find an earlier deemed filed date to apply. Regardless, the Court reached the merits of Petitioner's petition.

procedurally barred from evaluating Petitioner's claim that Respondent failed to prove Petitioner's guilt beyond a reasonable doubt because Petitioner failed to comply with New York Criminal Procedure Law § 470.05(2), which is New York's contemporaneous objection law.

Section 470.05(2) "require[s], at the very least, that any matter which a party wishes the appellate court to decide have been brought to the attention of the trial court at a time and in a way that gave the latter the opportunity to remedy the problem and thereby avert reversible error." Garcia v. Lewis, 188 F.3d 71, 78 (2d Cir. 1999) (quoting People v. Luperon, 85 N.Y.2d 71, 78 (1995)). With regard to Petitioner's claim, section 470.05 required Petitioner to challenge the sufficiency of the evidence with specificity before the trial court in order to preserve this claim for his appeal, which he failed to do when defense counsel made a general motion to dismiss. See People v. Hawkins, 11 N.Y.3d 484, 492 (2008) ("To preserve for this Court's review a challenge to the legal sufficiency of a conviction, a defendant must move for a trial order of dismissal, and the argument must be "specifically directed" at the error being urged. As we have repeatedly made clear – and underscore again – general motions simply do not create questions of law for this Court's review." (internal citations omitted)). As such, the Appellate Division found that his claim was not preserved for his appeal. Regardless, the Appellate Division found that "[t]he evidence at trial supported a finding that the defendant acted with intent to cause serious physical injury to the victim." Cinto, 80 A.D.3d at 775.

Federal courts are generally not permitted to "review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" Cone v. Bell, 556 U.S. 449, 465 (2009) (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)). A state law ground is deemed "adequate" if the rule "is firmly established and regularly followed by the state

in question." <u>Whitley v. Ercole</u>, 642 F.3d 278, 286 (2d Cir. 2011) (quoting <u>Garcia v. Lewis</u>, 188 F.3d 71, 77 (2d Cir. 1999)). New York's contemporaneous objection rule is a firmly established and regularly followed rule that provides an adequate and independent ground barring federal habeas review. <u>See</u> <u>Kozlowski v. Hulihan</u>, 511 F. App'x 21, 25 (2d Cir. 2013) ("the contemporaneous objection rule provides an independent state-law ground for barring federal habeas review"); <u>Downs v. Lape</u>, 657 F.3d 97, 104 (2d Cir. 2011) ("we have held repeatedly that the contemporaneous objection rule is a firmly established and regularly followed New York procedural rule"); <u>Garcia</u>, 188 F.3d at 79 ("we have observed and deferred to New York's consistent application of its contemporaneous objection rules.") Here, Petitioner's claim that the evidence was legally insufficient is procedurally barred because his failure to preserve his claim by raising a contemporaneous objection at trial was an adequate and independent state law ground upon which the Appellate Division rested its decision.

The fact that the Appellate Division proceeded to evaluate the merits of Petitioner's claim does not eliminate the procedural bar. "[W]hen a state court says that a claim is 'not preserved for appellate review' but then rules 'in any event' on the merits, such a claim is procedurally defaulted." <u>Green v. Travis</u>, 414 F.3d 288, 294 (2d Cir. 2005) (quoting <u>Glenn v. Bartlett</u>, 98 F.3d 721, 725 (2d Cir. 1996)); <u>see</u> <u>also</u> <u>Young v. New York</u>, 11 Civ. 0110 (JFB), 2012 WL 6644993, at *12 (E.D.N.Y. Dec. 20, 2012) ("When a state court relies on an independent and adequate state law ground – such as, in this case, failure to preserve the issue for appeal – federal habeas review is foreclosed. This is true even if the state court rules in the alternative on the merits of petitioner's claims." (citations omitted)). Accordingly, despite the alternative holding by the Appellate Division, Petitioner's sufficiency of the evidence claim is procedurally barred.

A federal court may review a claim that is procedurally barred by an independent and adequate state ground if "the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750; see also Rush v. Lempke, 500 F. App'x 12, 15 (2d Cir. 2012) ("When a petitioner 'has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.'" (quoting Coleman, 501 U.S. at 750)). Here, Petitioner has made no such demonstration. Thus, the procedural bar is not excused.

Nevertheless, the Court reviewed the merits of Petitioner's claim and found them without merit. A "petitioner 'bears a very heavy burden' when challenging the legal sufficiency of the evidence in a state criminal conviction." Archer v. Fischer, 05 Civ. 4990 (JFB), 2009 WL 1011591, at *8 (E.D.N.Y. Apr. 13, 2009) (quoting Einaugler v. Supreme Court of the State of N.Y., 109 F.3d 836, 840 (2d Cir. 1997)), aff'd, Mannix v. Phillips, 619 F.3d 187 (2d Cir. 2010). "In a challenge under 28 U.S.C. § 2254 to the evidentiary sufficiency of a state criminal conviction, . . . the applicant is entitled to habeas corpus relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial." Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir. 2002) (internal citations & quotations omitted); see also Malik v. McGinnis, 06 Civ. 3361 (RJS) (GWG), 2010 WL 3239216, at *13 (S.D.N.Y. Aug. 16, 2010) ("To prevail [on a sufficiency of the evidence claim], the [habeas] petitioner must show that upon the record evidence adduced at the trial no rational trier of fact could have found

proof of guilt beyond a reasonable doubt." (internal quotation marks omitted)); Vassell v. McGinnis, 04 Civ. 856 (JG), 2004 WL 3088666, at *5 (E.D.N.Y. Dec. 22, 2004) (a "state criminal conviction will be upheld if, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt'") (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). Indeed, "[e]ven when 'faced with a record of historical facts that supports conflicting inferences, [the court] must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" Archer, 2009 WL 1011591, at *8 (quoting Wheel v. Robinson, 34 F.3d 60, 66 (2d Cir. 1994)). In reviewing habeas claims predicated on the legal insufficiency of the trial evidence, the court "'must look to state law to determine the elements of [each] crime.'" Id. at *8 (quoting Quartararo v. Hanslmaier, 186 F.3d 91, 97 (2d Cir. 1999)); see also Ponnapula, 297 F.3d at 179.

Having reviewed the underlying state court record and the relevant provisions of New York Penal Law as set forth below, the court finds that the trial evidence, viewed in the light most favorable to the prosecution, amply supported the judge's conclusion that petitioner was guilty beyond a reasonable doubt of manslaughter in the first degree. Under New York Penal Law, a person is guilty of manslaughter in the first degree when, "[w]ith intent to cause serious physical injury to another person, he causes the death of such person or of a third person." N.Y. Penal Law § 125.20. Here, the sufficiency of the evidence, which included three eyewitness accounts and the testimony of an expert in forensic pathology, showed that Petitioner acted with the requisite intent to cause serious physical injury to Mr. Senisi when he stabbed him, and that by stabbing Mr. Senisi, he caused Mr. Senisi's death. See Testimony of Mr. Carillo, Trial Tr. at 32-37 (describing that Petitioner swung at Mr. Senisi and stabbed him on his left side);

Testimony of Mr. Terron, Trial Tr. at 76-83 (describing how Petitioner swung at Mr. Senisi with a six-to-twelve-inch cooking knife, yelling "stupid mother fucker" and stabbing him on the left side); Testimony of Mr. Efremov, Trial Tr. at 97-105 (describing how an individual of Mexican descent yelled something unintelligible and stabbed Mr. Senisi); Testimony of Dr. Persechino, Trial Tr. at 118-22 (stating that in her expert opinion the stab wound to Mr. Senisi's left side caused his death). Therefore, Petitioner's claim that there was insufficient proof to find that he was guilty of manslaughter in the first degree is denied.

### ii. Petitioner's Claims That He Was Denied Effective Assistance Of Counsel And That He Was Denied His Sixth Amendment Right To Confront The Witnesses Against Him Are Without Merit

Petitioner argues that his defense counsel was ineffective because he stipulated to the admission of a DNA report that found Mr. Senisi's blood on Petitioner's clothing without cross-examining the expert who performed the DNA analysis. Pet. at 7; Pet'r's App. Brief at 3-9. Respondent argues that the Appellate Division correctly concluded that Petitioner's ineffective assistance of counsel claim was without merit, and that as such, the Court may only grant Petitioner relief on this claim is the trial court's adjudication of the claim was contrary to, or an unreasonable application of, Supreme Court precedent. Resp. at 7.

The Court must evaluate Petitioner's claim of ineffective assistance of counsel under the two-prong test set forth in Strickland v. Washington, 466 U.S. 668 (1984), which is the applicable Supreme Court precedent. First, Petitioner "must show that counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms." Id. at 687-88. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690. Second, Petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

Decisions about trial strategy, "if reasonably made, cannot support an ineffective assistance claim." United States v. Smith, 198 F.3d 377, 386 (2d Cir. 1999). "The decision whether to call any witnesses on behalf of the defendant, and if so[,] which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." Id.; see United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000) ("[a]ctions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance") (internal quotations omitted); United States v. Schmidt, 105 F.3d 82, 90 (2d Cir. 1997) ("the tactical decision of whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation"). Additionally, the Second Circuit has held that defense counsel may "waive a defendant's Sixth Amendment right to confrontation where the decision is one of trial tactics or strategy that might be considered sound," which includes the decision to enter into stipulations. United States v. Plitman, 194 F.3d 59, 63-64 (2d Cir. 1999). The Second Circuit, in so finding, signaled the deference that it gives to defense counsel in making these trial strategy decisions.

Petitioner has not shown that defense counsel's representation fell below an objective standard of reasonableness. The decision to stipulate to the DNA report versus requiring the medical examiner to testify to her findings was a sound trial strategy that did not constitute ineffective assistance. See, e.g., People v. Knox, 80 A.D.3d 887, 889 (3d Dep't 2011) (defense counsel's "stipulation to admission of the forensic reports, without requiring live testimony from the fingerprint expert, DNA tester or firearms examiner, could be seen as part of a valid strategy to avoid dwelling on facts that would almost certainly be established and instead maintain his

focus on the hotly contested elements of possession and the applicability of the home exception"); <u>People v. Young</u>, 35 A.D.3d 958 (3d Dep't 2006) (defense counsel's conduct in drug prosecution of conceding that substance sold to undercover investigator was cocaine was reasonable trial strategy related to defense theory that defendant was merely a drug "mule" carrying drugs for others with no intent to sell, and therefore was not ineffective assistance"); <u>People v. Rodriguez</u>, 186 A.D.2d 838 (3d Dep't 1992) (stipulation to the introduction of a controlled substance and the laboratory report identifying it as such into evidence was not ineffective assistance of counsel where defense was based upon a theory that the defendant was not involved in the crimes alleged). As the medical examiner's testimony would have been directed mostly to the admissibility of the DNA report, there is no reason to believe that cross-examining the medical examiner would have been advantageous to Petitioner's case or would have resulted in the exclusion of the DNA report. Petitioner does not offer any basis in fact as to why the report would have been excluded for any scientific or similar reasons that might have been revealed on cross-examination of the medical examiner. Given that the case was tried to the bench, the Court was likely familiar with DNA evidence. It is unlikely that cross-examining the medical examiner about the evidence would have been fruitful.

Moreover, as is clear from his closing argument, defense counsel's strategy was to show that Petitioner did not intend to murder Mr. Senisi, not that Petitioner was completely innocent of the stabbing, so as to obtain a manslaughter conviction instead of a murder conviction for Petitioner. Trial Tr. at 151. Thus, admission of DNA report showing that the blood on Petitioner's clothing was Mr. Senisi's was incidental to defense counsel's strategy. As defense counsel succeeded in obtaining a manslaughter conviction instead of the murder conviction that Respondent sought, the record suggests that Petitioner's defense counsel was highly effective,

and his decision to agree to admit the DNA report did not fall below an objective standard of reasonableness.

Furthermore, as noted above, under the prejudice prong of <u>Strickland</u>, Petitioner was required to show that but for his defense counsel's errors, the result of the proceeding would have been different. "[W]here there is overwhelming evidence of guilt, even serious errors by counsel will not warrant granting a writ of habeas corpus." <u>Gersten v. Senkowski</u>, 426 F.3d 588, 611 (2d Cir. 2005). Here, defense counsel did not commit errors, and even if he had, there was overwhelming evidence of Petitioner's guilt including three eyewitnesses who testified that they saw Petitioner stab Mr. Senisi.

Petitioner received effective assistance of counsel; thus, the Appellate Division's rejection of Petitioner's claim was neither contrary to nor an unreasonable application of Supreme Court precedent. Therefore, Petitioner's claim that his counsel was ineffective for stipulating to the admission of DNA evidence instead of calling the medical examiner to the stand in order to cross-examine her is denied.

### iii. Petitioner's Claim That His Fifth Amendment Right To Counsel Was Violated Is Procedurally Barred By Independent And Adequate State Grounds And Is Without Merit

Petitioner argues that his oral and written statements were taken in violation of his right to counsel. Pet. at 5; Pet'r's App. Br. at 10-16. Notably, Petitioner neither contests that he was read his <u>Miranda</u> rights nor that he waived them. <u>Id.</u> at 13. He solely claims that his statements were taken in violation of his right to counsel. <u>Id.</u> at 10-16. Respondent argues that Petitioner's claim is procedurally barred as Petitioner failed to preserve it for appellate review and the Appellate Division found that it was without merit. Resp. at 11. Respondent also argues that the claim is without merit.

As discussed above with regard to Petitioner's first argument, this claim is also procedurally barred from federal review. The Appellate Division's decision with regard to this claim rested upon an adequate and independent state-law ground – i.e. that Petitioner did not raise the claim before the New York trial court that his statement was taken in violation of his right to counsel, and therefore, Petitioner did not preserve the claim for appellate review pursuant to section 470.05(2). See Cinto, 80 A.D.3d at 775. Moreover, the Appellate Division found the claim without merit. Id. Petitioner has also not alleged any circumstances justifying federal review of this procedurally barred claim. See Coleman, 501 U.S. at 750.

Nevertheless, the Court will address the merits of Petitioner's claim. The Supreme Court has recognized that a criminal defendant has a Sixth Amendment right to counsel and also a different "right to counsel" found "in this Court's jurisprudence relating to the Fifth Amendment guarantee that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.'" McNeil v. Wisconsin, 501 U.S. 171, 176 (1991). These two rights are different in their nature and effects. The Supreme Court has called the Fifth Amendment right to counsel the "Miranda-Edwards 'Fifth Amendment' right to counsel" because it arises in part from the Supreme Court's development of prophylactic Miranda rights which were developed to "counteract the 'inherently compelling pressures' of custodial interrogation." McNeil, 501 U.S. at 177 (citing Miranda v. Arizona, 384 U.S. 436, 475 (1966)). Thus, whereas the Sixth Amendment right to counsel seeks to "protect[t] the unaided layman at critical confrontations" with his "expert adversary," the government, after "the adverse positions of the government and defendant have solidified" with respect to a particular alleged crime," McNeil, 501 U.S. at 178 (citing United States v.Gouveia, 467 U.S. 180, 188 (1984)) (emphasis in the original), "the purpose of the Miranda-Edwards guarantee, on the other hand—and hence the purpose of

invoking it—is to protect a quite different interest: the suspect's 'desire to deal with the police only through counsel,'" McNeil, 501 U.S. at 178 (citing Edwards v. Arizona, 451 U.S. 477, 484 (1981)).

Although the Sixth Amendment right to counsel "arise[s] automatically on the initiation of the adversary process and no action by the defendant is necessary to make them active in his or her case," Taylor v. Illinois, 484 U.S. 400, 410 (1988), "[t]o trigger the right to counsel under the Fifth Amendment, the suspect must unambiguously request counsel[.]" United States v. Taveras, 04 Crim. 156 (JBW), 2006 WL 626248, at *6 (E.D.N.Y. Feb. 22, 2006) (citing Davis v. United States, 512 U.S. 452, 459 (1994)). "The Fifth Amendment right is not asserted until, at a minimum, the suspect has made some 'expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police.'" Clarke v. Goord, 07 Civ. 0366 (BMC), 2007 WL 2324965, at *4 (E.D.N.Y. Aug. 10, 2007) (citing McNeil, 501 U.S. at 178). "[H]e must articulate his desire to have counsel sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'" Taveras, 2006 WL 626248, at *6.

The Court's examination of the record shows that Petitioner was read his Miranda rights and that and he did not invoke his right to counsel either before or after he was read his rights or before he gave his statement to the officers. In his Petition, Petitioner does not even assert that he invoked his right to counsel and the detectives ignored him, but rather, Petitioner generally argues that he should have been provided counsel during his interrogation. As federal law required Petitioner to invoke his right to counsel during interrogation, and the record before the Court does not suggest that he made any invocation, the Court finds Petitioner's claim without merit.

**V.     Conclusion**

For the reasons set forth above, Petitioner's motion pursuant to 28 U.S.C. § 2254 is denied in its entirety.  Petitioner is further denied a certificate of appealability, as Petitioner failed to make a "substantial showing of the denial of a constitutional right."  See 28 U.S.C. § 2253(c)(2); see also Lucidore v. N.Y.S. Div. of Parole, 209 F.3d 107, 112 (2d Cir. 2000) (holding that a substantial showing exists where the issues involved in the case are debatable among jurists of reason, or a court could resolve the issues in a different manner, or the questions are adequate to deserve encouragement to proceed further).  The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and, therefore, in forma pauperis status is denied for purpose of an appeal.  See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

Dated:  Brooklyn, New York
           March 31, 2016

*Vera M. Scanlon*
_____
VERA M. SCANLON
United States Magistrate Judge